IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| KIMBERLEE MANOLOULES, Individually and b/n/f for DEMETRI MANOLOULES, <br><br> Plaintiffs, <br><br> v. <br><br> TENT RESTAURANT OPERATIONS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) Civil Action No. 3:08-cv-44 ) ) Judge Thomas A. Wiseman, Jr. ) ) |

## MEMORANDUM OPINION

Before the Court is the Motion for Summary Judgment (Doc. No. 27) filed by defendant TENT Restaurant Operations, Inc. ("TENT"), seeking judgment under Rule 56 as to all claims asserted against it by plaintiff Kimberlee Manoloules, individually and on behalf of Demetri Manoloules, her minor child (hereafter, "Manoloules" or "plaintiff" in the singular). TENT asserts that there are no genuine issues of material fact and that Manoloules cannot, as a matter of law and the undisputed evidence, maintain a cause of action under Tenn. Code Ann. § 57-10-101 *et seq.* Manoloules insists that material issues of disputed fact preclude summary judgment in this case. As set forth below, the Court disagrees and will grant summary judgment to the defendant.

I.   **STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, if the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the moving party has carried this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts based on evidence in the record showing that there is a genuine issue for trial. *Id.*; *accord* Fed. R. Civ. P. 56(e)(2).

After the parties have presented the evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party. *Matsushita*, 475 U.S. at 587. However, "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the" non-moving party. *Anderson*, 477 U.S. at 252.

## II. FACTUAL BACKGROUND

On December 28, 2006, Philip Grizzle, who was twenty-nine years old at the time, and his colleague Brian Nuckols, neither of whom is a party to this suit, had the day off from work and decided to get together at Nuckols' apartment in Portland, Tennessee to hang out and play video games on Nuckols' Xbox system. They played video games for an hour or two and then decided to drive from Portland to the Rivergate area outside Nashville to get something to eat. Grizzle drove the two in his Dodge pickup truck. When they arrived in Rivergate, a thirty- to forty-minute drive from Nuckols' apartment, they decided to go to Bailey's Sports Grille ("Bailey's"), a restaurant owned and operated by defendant TENT. Grizzle had not consumed any alcohol that day, prior to arriving at Bailey's. (Doc. No. 33, Pl.'s Resp. to Def.'s Statement Undisp. Material Facts, ¶¶ 1, 4, 6–10.)

It is unclear what time the two men arrived at Bailey's. Grizzle estimated that he arrived at Nuckols' apartment in the "[e]arly afternoon," around 1:30 or 2:00 p.m. (Doc. No. 39-1, 8/8/2009 Dep. of P. Grizzle ("Grizzle Dep.") at 12:2–7, 11–12), played video games for "an hour or so, couple hours, something like that" (Grizzle Dep. at 13:5–8), and (after the thirty- to forty-minute drive) probably arrived at Bailey's around 3:30 or 4:00 (*Id.* at 15:25–16:7).[1] Grizzle conceded that he was not entirely clear about the timing. (Grizzle Dep. at 53:1–6.)

Once Grizzle and Nuckols arrived at Bailey's, they claimed an empty pool table with a view of a football game. Grizzle testified that they arrived sometime during the first half of the game. Upon arriving, they ordered food and began playing pool. While eating his hamburger, Grizzle drank either a coke or a glass of water. Only after the men finished eating did they order their first beer. As mentioned above, they had not consumed any other alcohol that day prior to ordering beer at Bailey's. According to Grizzle, he and Nuckols ordered a pitcher of either Bud Light or Miller Lite and split it roughly evenly. When they finished that pitcher, they ordered a second one, which they also finished. Grizzle testified, somewhat vaguely, that he believed a pitcher of beer contained "maybe four glasses," such that he and Nuckols each consumed approximately two glasses of beer per pitcher. They also continued to play pool and watch the football game while drinking beer. They decided to leave sometime shortly after the game ended. According to Grizzle, he did not feel intoxicated and would not have gotten into his vehicle if he had believed he was intoxicated.

---

[1] Manoloules claims that Grizzle conceded in his deposition that the men might have arrived at Bailey's as early as 1:30 or 2:30. (*See* Doc. No. 33, Pl.'s Resp. to Def.'s Statement Undisp. Material Facts, at ¶ 2 (citing Grizzle Dep. at 53:7–10).) The deposition testimony cited in support of that assertion cannot reasonably be understood thus. The entire passage upon which Manoloules relies is as follows:

> Q [by plaintiff's counsel]: As far as the time you got – at what time you got to Brian's, what time you left Brian's, what time you got to Bailey's, what time you left Bailey's, is it fair to say that you're not real clear about all those times?
> A: That's correct.
> Q: Okay. So what you have testified about today, if you stayed there, got there about 1:30, 2:30, it's basically an estimate?
> A: Yes.

(53:1–10.) At that point in the deposition, the only prior testimony to which Manoloules' counsel could have been referring was Grizzle's statement, in response to questioning by defense counsel, that he probably had arrived at Nuckols' apartment around 1:30 or 2:00. The undefined "there" in counsel's question can only be reasonably construed, in context, to refer to Nuckols' apartment, not to Bailey's. In other words, in the quoted passage, Grizzle was apparently agreeing with plaintiff's counsel that his testimony about what time he had arrived at Nuckols' apartment was merely an estimate.

Notwithstanding Grizzle's testimony regarding how much alcohol he had consumed at Bailey's, at 7:19 p.m., shortly after they had left Bailey's, Grizzle ran a red light and collided head-on with another vehicle, injuring both passengers, Kimberlee Manoloules and her son Demetri. Grizzle also incurred injuries and claims not to remember how the accident occurred. For purposes of its motion, the defendant concedes that Grizzle was at fault in causing the accident.

Grizzle was taken to Skyline Medical Center where he was treated for a concussion and a severe laceration to his head. While he was at the hospital, at 8:30 p.m., his blood was drawn for the purpose of generating an alcohol and toxicology report for the Tennessee Bureau of Investigation. The results of Grizzle's blood screen revealed that his blood-alcohol concentration ("BAC") at 8:30 p.m. on the evening in question was 0.13%. (Doc. No. 43-4, at 5, TBI Official Alcohol Report.) In addition, the blood screen revealed the presence of 19.2 nanograms per milliliter of 9-Carboxy-11-nor-delta-9 THC, a marijuana metabolite, in his blood. (Doc. No. 43-4, at 3, TBI Official Toxicology Report.) Based on the results of the Alcohol Report and taking into consideration Grizzle's gender and weight as well as the estimated time period during which he had consumed alcohol prior to having his blood drawn, the plaintiff's expert witness, E. Howard Taylor, Ph.D., estimated that Grizzle had consumed between 6.3 and 7.3 alcoholic beverages while at Bailey's, depending on whether he began drinking at 5:00 p.m., 3:00 p.m. or somewhere in between and assuming that all of the alcohol had been absorbed into his bloodstream by 7:00 p.m. (Doc. No. 43-5, at 1 (5/22/2009 Letter from Taylor to R. Edwards supplementing his expert report).) Dr. Taylor also estimated that a standard restaurant pitcher holds approximately sixty ounces, or the equivalent of five 12-ounce beers. (Doc. No. 37-1, 5/5/2009 Dep. of Dr. E.H. Taylor ("Taylor Dep.") at 162:21–23.) According to Dr. Taylor, the presence of the marijuana metabolite in Grizzle's blood indicated he had smoked marijuana within twenty-four hours of the accident. (Doc. No. 43-5, at 1.)

Dr. Taylor also opined that, given Grizzle's weight and the fact that he had a BAC of 0.13% at 8:30 p.m., Grizzle would have had a BAC of between 0.146 and 0.163 grams per deciliter at 7:00 p.m., the approximate time of leaving Bailey's, again assuming all the alcohol he had consumed had already been absorbed into his bloodstream. Finally, Dr. Taylor states in his Supplemental Report that a person whose BAC is that high would show physical signs of intoxication including: "Increased Self Confidence, Decreased Inhibitions, Loss of Critical Judgment, Sensory Motor Impairment and Incoordination, Impaired

Balance, Impairment of Perception, Increased Reaction Time, Reduced Visual Acuity and Peripheral Vision." (*Id.* at 2.) Dr. Taylor did not opine as to whether these signs would have been readily apparent to a casual observer, such as a restaurant server, who did not know the person well.

Moreover, in his deposition, Dr. Taylor conceded that, if Grizzle had consumed roughly half of one pitcher of beer before ordering a second pitcher of beer, he likely would not have appeared visibly intoxicated at the point in time when he ordered the second pitcher of beer:

> Q [by defense counsel]. And we know at the time he ordered the second pitcher, that was approximately two hours prior to the accident, right?
>
> A. Theoretically if they were drinking pretty much consistently throughout the whole time period.
>
> Q. Which is what he testified to?
>
> A. Yes.
>
> Q. Then they would have ordered their last pitcher of beer about two or so hours before the accident?
>
> A. Yes.
>
> Q. We know that beyond a reasonable doubt is the highest standard under the law?
>
> A. Yes, it is.
>
> Q. I'm asking you Dr. Taylor . . .[c]an you state beyond a reasonable doubt that at the time Mr. Grizzle was served the second pitcher of beer at 5:30 p.m. he appeared obviously intoxicated?
>
> A. No, I can't say that at that time that he was served a second pitcher because he would have had only two or three drinks based on that first pitcher.

(Taylor Dep. at 166:15–167:17.)

### III.  LEGAL ANALYSIS

#### A.  The Effect of Tenn. Code Ann. §§ 57-10-101 and 57-10-102

Manoloules' claims against TENT are brought under Tenn. Code Ann. § 57-10-101 *et seq.*, which provides that an individual who furnishes alcohol to another is not, as a general principle, liable for any damages resulting from the other's intoxication, unless certain very specific conditions are met. *Biscan v. Brown*, 160 S.W.3d 462, 472 (Tenn. 2005). Specifically, § 57-10-101 states:

> The general assembly hereby finds and declares that the consumption of any alcoholic beverage or beer rather than the furnishing of any alcoholic beverage or beer is the proximate cause of injuries inflicted upon another by an intoxicated person.

According to the Tennessee Supreme Court, "[t]he effect of section [57-10-]101 is to make it impossible for one who has been injured by an intoxicated person to state a claim for negligence against the person or entity who furnished the alcoholic beverage or beer because the statute removes, as a matter of law, the required element of legal causation." *Biscan*, 160 S.W.3d at 472 (citation omitted). "The statute does not merely provide immunity. . . . [T]he statute constitutes the legislative determination that persons who furnish alcohol are not at fault for injuries inflicted by an intoxicated person." *Id.* As the court further explained, "the effect of the provision is not merely to restrict the remedy for a cause of action, but to remove that cause of action entirely, making a person or entity who furnishes alcohol immune from fault as well as immune from liability." *Id.* at 474.

This general principle may only be overridden if a "jury of twelve (12) persons has first ascertained *beyond a reasonable doubt* that the sale by such person of the alcoholic beverage or beer was the proximate cause of the personal injury or death sustained *and* that such person . . . [s]old the alcoholic beverage or beer to *an obviously intoxicated person* and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer." Tenn. Code Ann. § 57-10-102 (emphasis added).[2] In the absence of such proof, an injured person has no viable cause of action against one who furnishes beer or alcohol. Tennessee courts, moreover, construe the statute strictly. *Worley v. Wiegels, Inc.*, 919 S.W.2d 589, 592 (Tenn. 1992).

In the present case, TENT argues that there is no evidence in the record that Grizzle was obviously intoxicated at the time he and Nuckols purchased their second pitcher of beer—much less evidence from which a reasonable jury could conclude "beyond a reasonable doubt" that Grizzle was "obviously intoxicated" at that moment, as the statute requires. Manoloules contends that there is at least a material issue of fact as to that question.

### B. Whether a Reasonable Jury Could Conclude that Grizzle Was "Obviously Intoxicated" When Bailey's Sold Him Alcohol

The relevant question, for purposes of determining whether TENT can be liable for Manoloules' injuries, is whether Grizzle was "obviously intoxicated" at the time Bailey's "[s]old the alcoholic beverage or beer" to him. Tenn. Code Ann. § 57-10-102(1). The Tennessee legislature did not define the terms

---

[2] Another exception is provided for when alcoholic beverages are furnished to a person under the age of twenty-one.

"sold" or "obviously intoxicated," nor has any Tennessee appellate court defined these terms. In passing the Alcohol Server and Responsibility Act of 1995, however, the legislature delegated to the Tennessee Alcoholic Beverage Commission ("Tennessee ABC") the authority to develop rules to enforce the law. The Tennessee ABC developed rules for provisional alcohol server training, which define "visible intoxication" as "[a]n impairment of an individual's mental or physical faculties as a result of drug and/or alcohol consumption accompanied by a perceptible act, series of acts, or by the appearance of an individual which clearly demonstrates such impairment." Tenn. Comp. R. & Regs. Ch. 0100-8-.02.DEFINITIONS.(9). Similarly, but more succinctly, the plaintiff's expert, Dr. Taylor, agreed with defense counsel's definition of intoxication as "the appearance of atypical behavioral changes that are readily perceived by untrained observers." (Taylor Dep. at 13:9–13.)

The other question, though neither party actually raises it, is when did the sale of beer to Grizzle and Nuckols actually occur? There is a potential argument that the sale was concluded at the time that the young men closed out their tab shortly before they left the bar.[3] The Court rejects that argument and holds, as a matter of contract law and common sense, that a bar or restaurant sells the alcoholic beverage or beer to the patron at the time the patron requests and then accepts a drink from the server. *Cf.* Restatement (Second) of Contracts § 50 (defining acceptance of an offer); *Jamestowne on Signal, Inc. v. First Fed. Sav. & Loan Ass'n* 807 S.W.2d 559, 565 (Tenn. Ct. App. 1990) (discussing the elements required to establish the formation of a contract).

In implicit reliance upon that definition of when a "sale" occurs, TENT points to the testimony of Dr. Taylor, quoted above, in which he conceded that it was unlikely that Grizzle was "obviously intoxicated" at the time he ordered the second pitcher of beer because he would only have consumed the equivalent of two or three beers by that time. Manoloules does not dispute the relevance of that particular moment for determining Bailey's potential liability. Rather, Manoloules argues that Dr. Taylor's statement was made in the context of his assuming, based on counsel's questioning, that Grizzle and Nuckols drank no more than two pitchers of beer between them, which is itself a disputed issue of fact. Specifically, Manoloules argues that Grizzle's testimony is refuted by Dr. Taylor's expert analysis which suggests

---

[3] Again, Nuckols has not been deposed, for whatever reason, and Grizzle's testimony regarding the precise timeline of events is vague, to say the least. He is not sure whether he purchased the beer or whether Nuckols paid for it or whether, if he paid, he used cash or a debit card.

Grizzle drank substantially more than one-half of each of two pitchers. However, even accepting as true Dr. Taylor's testimony regarding the amount of alcohol consumed by Grizzle on the afternoon in question (as the Court must in considering the defendant's motion for summary judgment), the Court finds that Grizzle's testimony is the only evidence in the record regarding how the beer was consumed, and his testimony in that regard is not necessarily inconsistent with Dr. Taylor's. That is, assuming the men ordered two pitchers of beer, and that Grizzle drank substantially more than his fair share—meaning he consumed between 6.3 and 7.3 beers twelve-ounce beers as Dr. Taylor estimated, TENT is correct that there is simply no evidence in the record that Grizzle was "obviously intoxicated" at the time the men ordered the last pitcher.[4] Dr. Taylor's testimony regarding the visible signs of intoxication Grizzle might have been exhibiting at 7:00, assuming all the alcohol had been absorbed into his system by then, is immaterial, as it has no bearing on Grizzle's demeanor as much as an hour or more prior to 7:00, at the time he ordered the last pitcher from Bailey's server. For the same reason, the police officer's affidavit in the underlying criminal proceedings, indicating Grizzle's speech was slurred and his eyes red immediately after the accident (and after he had incurred a concussion and a laceration to his head), is not relevant to show that he was obviously intoxicated at the time he purchased beer from Bailey's.

Further, even if the Court were to presume that the beer was not "sold" until Grizzle and Nuckols paid for it, the Court would still conclude that TENT is entitled to summary judgment on the basis of absence of evidence in the record from which a reasonable jury could conclude *beyond a reasonable doubt* that Grizzle was "obviously intoxicated" at that time. Again, even crediting Dr. Taylor's testimony regarding the symptoms a person whose BAC is around 0.15% would ordinarily display, none of the symptoms he enumerated would necessarily be visible to a casual observer. More to the point, there is no evidence whatsoever in the record that Grizzle himself was actually exhibiting any of those signs. If the standard of proof on this issue were the "preponderance of evidence" standard normally applicable in a civil suit, there might potentially be sufficient evidence in the record to allow a reasonable jury to infer that Grizzle was "obviously intoxicated" at the time he and Nuckols left the bar and thus to compel denial

---

[4] Even if a jury could find that Grizzle was confused (or lying) about how many pitchers he and Nuckols ordered and that they actually got three pitchers of beer instead of two, and that Grizzle drank roughly half of each of them to arrive at the 6.3 to 7.3 beers estimated by Dr. Taylor, the jury would have to reach the same conclusion: There is still no evidence in the record that Grizzle was visibly intoxicated at any time he purchased beer from Bailey's.

of the motion for summary judgment. Given that the standard is the same applicable in criminal actions—beyond a reasonable doubt—some actual evidence that Grizzle appeared drunk at the time Bailey's "sold" beer to him, whether or direct or circumstantial, is required to defeat the motion for summary judgment. The defendant has pointed to evidence in the record that Grizzle was *not* visibly intoxicated when the men left the bar, namely Grizzle's own testimony that he did not feel intoxicated, was not exhibiting behavior typically associated with intoxication, and would not have driven if he had felt intoxicated. Manoloules has pointed to no countervailing evidence in the record on that point sufficient to create a material issue of fact.[5]

The Court takes no great pleasure in reaching this conclusion, but there are two salient points that must be kept in mind here: First, while there is no dispute that Grizzle was actually impaired by alcohol when he got into his vehicle and at the time of the accident that injured Manoloules and her son, the fact of Grizzle's impairment does not lead necessarily to a conclusion that he was "visibly intoxicated" from the perspective of a third person at the time of sale, which is what the statute requires. Second, the statute embodies a public-policy decision consciously adopted by the Tennessee legislature. It is not within the province of this Court to dispute or overturn what has been adopted as the public policy of this State.

## IV. CONCLUSION

For these reasons, defendant TENT's motion for summary judgment will be granted and this matter dismissed. An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge

---

[5] The Court previously granted TENT's motion to strike the affidavit of Brian Nuckols and therefore has not considered that affidavit in the course of ruling on the defendant's motion for summary judgment. Notwithstanding, the Court notes that there is nothing in Nuckols' affidavit that would have compelled a different conclusion with regard to whether Grizzle was ever "visibly intoxicated" at the time he purchased beer from Bailey's.